UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:13-cv-175-FDW

| | | |
|---|---|---|
| **ROBERT S. BALLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **NC DEPARTMENT OF** | ) | **ORDER** |
| **PUBLIC SAFETY,** | ) | |
| **MARTA M. KALINSKI, Doctor,** | ) | |
| **PAULA SMITH, Doctor, Director of** | ) | |
| **Health Services,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment, (Doc. No. 90), and on Plaintiff's Motion for Issuance of Subpoena for Copy of Dept. of Public Safety, (Doc. No. 95).

## I.       BACKGROUND

### A.       Procedural Background

Pro se Plaintiff Robert S. Ballard is a North Carolina state court inmate currently incarcerated at Maury Correctional Institution in Maury, North Carolina. On December 26, 2013, Plaintiff filed this action under 42 U.S.C. § 1983, alleging that Defendant Marta Kalinski and other Defendants were deliberately indifference to Plaintiff's serious medical needs while Plaintiff was incarcerated at Alexander Correctional Institution ("Alexander") in Taylorsville, North Carolina. Following initial review, this Court dismissed all Defendants except for Defendant Kalinski. (Doc. No. 19). Kalinski is a physician employed by DPS and was involved

in Plaintiff's medical care at Alexander from August 2013 to February 2014.  Plaintiff claims to have continuously taken "some form of pain medication"—principally Oxycodone—for chronic and severe pain since 2004.  (Doc. No. 1-1 at 3-5; 6).  Plaintiff purports to bring a deliberate indifference claim against Dr. Kalinski on the grounds that she unjustifiably took away "all of [his] pain medications" in November 2013.  (Id. at 6).  Plaintiff seeks injunctive relief and compensatory damages.

On July 9, 2015, Defendant filed the pending summary judgment motion.  (Doc. No. 90).  On July 15, 2015, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court.  (Doc. No. 92).  Plaintiff filed a Response brief to the summary judgment motion on August 17, 2015, and Defendant filed a Reply brief on August 25, 2015.

**B.**     **Factual Background**

**1.**     **Plaintiff's Allegations and Summary Judgment Materials**

Plaintiff alleges that in late spring or early summer of 2013, while Plaintiff was incarcerated at Alexander Correctional Facility, Defendant Dr. Kalinski took Plaintiff off of his pain medications that are vital to his well-being.  Plaintiff alleges that Dr. Kalinski took him off of the pain medication because of an inaccurate report submitted to the doctor.  Plaintiff alleges that Dr. Kalinski had no cause to take away his pain medication.

Plaintiff alleges that he initially hurt his back in 2004 when he fell off of a ladder.  (Doc. No. 1 at 3).  Plaintiff received treatment from 2004 until he was incarcerated in 2010.  Plaintiff received an MRI while at Central Prison in Raleigh, North Carolina.  (Id. at 3-4).  The MRI showed damage to multiple vertebrae, and a doctor at Central Prison prescribed pain medication

for Plaintiff. Plaintiff alleges that, beginning sometime before June 2012, he was prescribed two, 5] mg tablets of Percocet, which he took four times a day. (Doc. No. 1-1 at 3). In June 2012, Plaintiff was transferred to Alexander, where Dr. Larry Jones first provided care to him. (Id. at 4). Dr. Jones "ordered a different pain medication and it worked for a while." (Id.). Later, Plaintiff "went back to see Dr. Jones and asked him to read [an] MRI from [Central Prison] Hospital that was done in November 2011." (Doc. No. 6-2 at 1). Dr. Jones then "continued [Plaintiff's] pain meds," specifically resuming Plaintiff's prescription of Percocet. (Id.). Dr. Jones continued serving as Plaintiff's physician until Dr. Kalinski replaced him in mid-2013. (Id.).

On his first visit to see Dr. Kalinski, Plaintiff asked for an increase in his pain medications. (Doc. No. 6-2 at 1). Plaintiff alleges Dr. Kalinski "then read the [2011] MRI report" and ordered "an extra dose of [Percocet] at 9:30 p.m." (Id.). Dr. Kalinski discontinued the extra dose of Percocet after "a couple of weeks." (Id.). Plaintiff became unhappy when his extra dose was discontinued, so he went back to Dr. Kalinski and asked her again to increase his medication. (Id.). To plead his case to Dr. Kalinski, Plaintiff says he obtained "part of [his] records" from a "pain clinic" (Advanced Interventional Pain Management, or "AIPM") and asked Dr. Kalinski to review them and "see what [Plaintiff] had been through." (Id. at 2). Plaintiff says Dr. Kalinski reacted to these records by telling him, "I'm taking you off all meds for pain because I got the records from the pain clinic, and it says you were going to 3 doctors at the same time." (Id.). Plaintiff disputed the report from the clinic and he alleges that the report was incorrect. According to Plaintiff, Dr. Kalinski then took Plaintiff off "all of [his] pain medications." (Id.). Plaintiff alleges that he requested to be sent to a neurologist, but Dr. Kalinski would not allow it. (Doc. No. 1-1 at 5-6). Plaintiff then wrote a letter to Dr. Paula

Smith, the head of Health Services for the Department of Public Safety, with regard to being taken off of his pain medication and not being allowed to see a neurologist. (Id. at 6). Plaintiff alleges that he never received a response. (Id.). At the time he filed the Complaint, Plaintiff claims that he was "in constant pain 24 hours a day with no relief at all." (Id.).

In response to Defendant's summary judgment motion, Plaintiff has submitted some of his medical records, his own memorandum in opposition to the summary judgment motion, and his own sworn declaration. In his response brief, Plaintiff mostly reiterates the allegations made in the Complaint, and he contends that Defendant Kalinski's statements are contradicted by the medical evidence of record.

### 2.    Defendant's Summary Judgment Materials

### a.    Background

In support of the summary judgment motion, Defendant Kalinski relies on the pleadings, Plaintiff's medical and prison records, the affidavit of Wells Edmundson, M.D., and Defendant's own affidavit.[1] See (Doc. Nos. 90-1; 90-2; 90-3). Defendant's summary judgment materials show that Plaintiff is a 60-year-old prisoner who began serving an approximate 22-year aggregate sentence in 2012, mostly based on opium/heroin trafficking convictions. (Doc. No. 90-3 at 64). Plaintiff alleges that he has suffered from chronic and severe pain since 2004, when a ladder collapsed underneath him and caused him to fall from a height of 28 feet. (Doc. No. 1-1 at 2). In that same year, however, Plaintiff told one of his health care providers that he had dealt with "extreme back pain for quite a number of years." (Doc. No. 90-1 at ¶ 14: Kalinski Aff.). Over the years that followed, Plaintiff's "back continued to get worse," and he acquired "strong

---

[1] Defendant Kalinski's affidavit contains cross-references to Plaintiff's medical records attached as Docket Number 90-3.

pain medications" from "several doctors on the streets." (Doc. No. 1-1 at 3). He also received

"shots in his back several times" to alleviate his pain, and he "had to learn to walk again." (Id.).

### b. Dr. Kalinski's Treatment of Plaintiff

The available medical records indicate Plaintiff took several different pain medications over various time periods between 2004 and August 2013, when Dr. Kalinski began providing care to Plaintiff. (Doc. No. 90-1 at ¶ 9). These medications included the narcotic and controlled substance Oxycodone, an addictive and powerful opiate that can be used either as a stand-alone medication (i.e., Roxicodone or OxyContin), or as an ingredient in combination with non-opiate pain relievers such as ibuprofen (i.e., Combunox), aspirin (i.e., Percodan), and acetaminophen (i.e., Percocet, Norco, or Vicodin). (Id.). Patients who become addicted to Oxycodone may exhibit drug-seeking behavior, such as requesting the medication by name, reporting their medications to be lost or stolen, requesting early refills without explanation, reporting they are out of medication, refusing to comply with pill count instructions, making inconsistent representations about their history of taking the medication, and becoming agitated when healthcare providers reduce or eliminate their access to the medication. (Id.). Chronic use or abuse of Oxycodone can lead to cardiovascular instability, respiratory distress, immunosuppression, psychiatric disorders, and sleep apnea. (Id.). Plaintiff's history of narcotic opiate use includes Roxicodone, OxyContin, Norco, and Percocet. (Id.). He also has taken multiple non-narcotic pain medications, including aspirin, acetaminophen, ibuprofen, and tramadol. (Id.). In addition to his pain medication history, Plaintiff's medical history includes numerous cardiovascular problems, including hypertension, multiple heart attacks and multiple stent placements, and poor compliance with taking his cardiac medications. (Id.).

Defendant's evidence on summary judgment shows that when Dr. Kalinski began

providing care to Plaintiff on August 6, 2013, she prescribed Plaintiff the same dosage of Percocet that he had previously received from Dr. Jones. (Doc. No. 90-1 at ¶ 13). On August 9, 2013, she prescribed a fifth, two-tablet dose of Percocet for Plaintiff to take in the evening, with a goal of reducing his pain symptoms overnight and in the early morning hours. (Id.). On August 22, 2013, Dr. Kalinski examined Plaintiff after he presented with symptoms of a heart attack. (Id.). Plaintiff refused to go to the hospital emergency room, so Dr. Kalinski obtained cardiac enzymes and an EKG in the facility. (Id.). On August 24, 2013, Dr. Kalinski considered prescribing either Neurontin or Tegretol for Plaintiff's apparent manifestation of chronic pain syndrome. (Id.). She also noted at that time—months before she received Plaintiff's AIPM record—that she would consider lowering Plaintiff's Oxycodone level "very soon." (Id.).

On August 30, 2013, Dr. Kalinski again ordered Oxycodone 5/325 mg, two tablets, four times daily as needed for thirty days. She stressed to Plaintiff that the medication was to be taken only when needed. (Id.). Plaintiff next saw Dr. Kalinski on September 3, 2013, when he complained that he was unhappy about his pain management treatment and asked for a higher dose of pain medication. (Id.). He told Dr. Kalinski that his lower back pain was interfering with his daily activities, and he also reported not getting his pain medications on time. (Id.). In response, Dr. Kalinski ordered Plaintiff to observe comprehensive activity restrictions—standing was limited to no more than thirty minutes at a time, walking was limited to no more than ½ mile at one time; sitting was limited to sixty minutes at one time and four hours for an eight-hour period; climbing was limited to one flight of stairs; lifting, pushing, and pulling was limited to twenty-five pounds; and she ordered no bending at the waist, working in a cramped position, mopping, sweeping, or twisting. (Id.). She also ordered a bottom bunk and again ordered Oxycodone 5/325 mg, two tablets, four times daily for thirty days. (Id.).

6

On September 27, 2013, Plaintiff complained again to Dr. Kalinski, this time reporting poor lower back pain control and saying his medication regimen was "not keeping him painfree." (Id.). Dr. Kalinski told him that she would review some of his prior medical records and his MRI results, and she ordered Oxycodone 5/325 mg, two tablets, four times daily for thirty days. (Id.). On November 1, 2013, Dr. Kalinski noted that she had reviewed Plaintiff's records from AIPM, which she found to "strongly confirm the patient's addiction to narcotic medication use. Patient was using different pain clinics to obtain a very large supply of strong narcotic medications every month. Often patient was not reporting the truth about the use of controlled substances." (Id.). Accordingly, Dr. Kalinski planned to reduce Plaintiff's Oxycodone use. (Id.). She ordered a 30-day regimen of Oxycodone 5 mg, with Plaintiff taking two tablets in the morning and at bedtime, and taking one tablet at midday and in the afternoon. She noted her "decision [was] made after review of his past medical records from the Pain Clinics." (Id.).

On November 5, 2013, Plaintiff went to the Catawba Memorial Hospital Emergency Room ("Catawba ER") after complaining of chest pain. (Id.). At the time of his emergency room visit, Plaintiff's blood pressure was 123/82 mmHg. (Id.). One day later, Dr. Kalinski noted that Plaintiff's cardiac workup at the emergency room had been negative, and she noted that she was concerned that Plaintiff's blood pressure "shows very questionable fluctuations." (Id.). At the time of Dr. Kalinski's assessment, Plaintiff's blood pressure was 189/113 mmHg. (Id.). She then reasoned that "[a]t this point, I will go further with tapering down [Plaintiff's] Oxycodone since the medication may provoke heart arrhythmia and additional complications in the form of respiratory depression, seizures, skin diaphoresis and hypothermia like patient may have presented [the day before], since he was found to be cold and without any signs of extra sweating." (Id.). Dr. Kalinski ordered Percocet 5/325 mg, one tablet, four times daily for one

week, and then one tablet twice daily for one week, then one tablet at bedtime for one week, and then to stop the medication. (Id.). At the same time, however, she also ordered a three-month provision of Tylenol Arthritis 650 mg, to be taken three times daily and as needed for pain. (Id.). On November 8, 2013, Plaintiff again reported chest pain of a non-cardiac origin. (Id.). Plaintiff "acted very upset when [Dr. Kalinski] did not agree to give him Oxycodone for pain," and he "changed the subject [from chest pain] to his lower back and demanded controlled substances for pain." (Id.). Dr. Kalinski again noted Plaintiff's medical history, which "strongly suggested excessive narcotic use and no improvement in any mode of treatment. Just like here, [Plaintiff] kept demanding stronger analgesics, controlled substances, and dose increases." (Id.).

Just one week later, on November 14, 2013, Dr. Kalinski saw Plaintiff after he reportedly fell and hit his back. According to her note, however, Plaintiff had been caught on camera moving comfortably and without obvious signs of severe lower back pain, but then he fell down as soon as one of the security personnel was in the vicinity and able to witness his fall. Dr. Kalinski ordered Toradol, 60 mg intramuscular injections at 1500 for one week, as well as Oxycodone 5/325 mg, in the morning and at bedtime for one week. She also ordered a walker to be supplied to him for two weeks. (Id.).

On the day after Plaintiff's reported fall, a nursing note mentions Plaintiff complained of back pain and asked for his pain medication to be increased to normal. (Id.). However, Plaintiff refused to have his vitals taken, refused to use his walker, and refused a nursing assessment. (Id.). He also said he would bring back all of his medications to the medical unit and would no longer take any of his medications. (Id.). In response to Plaintiff's complaints and behavior, Dr. Kalinski ordered that when Plaintiff was finished with his Oxycodone 5/325 mg tablets twice daily, he would start Oxycodone 5/325 mg tablet at bedtime for one week and then stop. (Id.).

On November 16, 2013, two days after his first alleged fall, Plaintiff reported to a nurse that he had fallen when his "leg went out from under [him]" as he exited an elevator. (Id.). To alleviate pain, Plaintiff received a five-day supply of Ibuprofen 400 mg. (Id.). On December 11, 2013, Dr. Kalinski wrote that the nursing staff had discovered that Plaintiff was "overdosing sublingual nitroglycerin use . . . to provoke side effects. Patient has been evaluated multiple times for 'chest pain' and all recent episodes were found to be non-cardiac related. Plaintiff maintains drug seeking behavior. He is malingering mainly acute chest pain or severe lower back pain." (Id.).

On December 13, 2013, Plaintiff declared a medical emergency and claimed to be suffering from chest pain. He later pleaded guilty to charges of feigning the illness and using profane language toward a nurse. (Id.). On December 30, 2013, Plaintiff complained of left lower quadrant abdominal pain with rectal bleeding and pain. (Id.). Dr. Kalinski determined that Plaintiff was malingering to obtain controlled substances. (Id.). Even so, Dr. Kalinski ordered Tylenol Arthritis 650 mg by mouth daily and also ordered two doses to be given to Plaintiff immediately. (Id.).

On January 16, 2014, Nurse Practitioner Guinn noted that Plaintiff requested to keep pain medications in his cell. (Id.). When he was reminded that he had access to Tylenol Arthritis, he refused to remain in the exam room, refused examination, became belligerent, and was escorted out by officers. (Id.). On January 24, 2014, Nurse Kimberly Towery documented that when Plaintiff was reminded that Tylenol was available to alleviate pain symptoms, he became belligerent and was escorted out by officers. (Id.). On February 13, 2014, Dr. Kalinski ordered another three-month prescription of Tylenol Arthritis for Plaintiff. On February 19, 2014, after Plaintiff complained of severe lower back pain, Dr. Kalinski assessed a chronic pain syndrome

and again ordered Oxycodone 5 mg, twice daily, for thirty days, along with an extra mattress to be provided for seventy-two months. This was the last order by Dr. Kalinski, and other providers managed Plaintiff's subsequent care. (Id.).

**c.    Defendant's Evidence Regarding Plaintiff's History of Drug Abuse and Drug-Seeking Behavior**

According to Defendant's summary judgment materials, Plaintiff's medical records show a long history of behavior consistent with Oxycodone abuse. Long before Dr. Kalinski ever became involved in Plaintiff's care in 2013, many other healthcare providers expressed concern about Plaintiff's drug-seeking behavior. Plaintiff's history of drug-seeking behavior dates back to at least 2004, the year of Plaintiff's back injury. In May of that year, Plaintiff told a physician's assistant at Wilkes Surgical Clinic that he had coped with "extreme back pain for quite a number of years" and had seen "six doctors in [the] last two months." (Doc. No. 90-1 at ¶ 14).

On May 9, 2008, Plaintiff was a patient at Pitt County Memorial Hospital ("PCMH") in Greenville. (Id.). During his admission, Dr. Jose Jacob noted Plaintiff had a "[h]istory of pain, medication-seeking. Plaintiff also was reportedly "always asking for morphine and narcotics for pain, and requesting pain medications all the time." (Id.). On May 19, 2008, Dr. M. Suzanna Kraemer noted in PCMH records that "in the past and during this hospitalization [Plaintiff] continued to complain of pain while clinically the patient seemed comfortable and vital signs have been stable." (Id.). She also noted that Plaintiff "has a history of drug-seeking behavior." (Id.).

On September 8, 2008, Plaintiff went to the Catawba Valley Medical Center ER for chest pain. (Id.). One of his providers, Dr. Gary W. Greer, documented that "[t]he patient, when

informed that he would not receive any narcotic pain medication, has requested to leave the hospital against medical advice. However, he was unwilling to sign out against medical advice or assume responsibility in his care." (Id.). Three weeks later, Dr. Giometti at Catawba Valley Medical Center again noted Plaintiff had been back to the ER "several times . . . [t]ypically wanting opiates for his pain." (Id.).

On May 28, 2010, a note from Dr. Lee Campbell at AIPM mentions that Plaintiff failed to follow the physician's instructions and bring his then-current OxyContin prescription with him to the clinic for a pill count. (Id.). Plaintiff was told that if he failed to bring his prescription to the next appointment, then Dr. Campbell would "not be able to provide any further narcotic medications secondary to violation of the opioid agreement and possibility of Plaintiff selling his medication. A DMHDDSAS query report shows Plaintiff obtaining multiple opioid medications from Dr. Snyder in Elkin, NC and Durham, NC." (Id.).

On June 24, 2010, Plaintiff's next visit to AIPM, Dr. Campbell noted that Plaintiff had failed to "bring his discontinued OxyContin tablets in today for count and disposal. He has been instructed twice to do this. He states that he will bring them next month and is requesting a refill of his normal medication. [Dr. Campbell] instructed [Plaintiff] last month that if he does not bring his OxyContin in with him at the next visit that he will not be able to obtain any further opioid medications from AIPM." (Id.). Dr. Campbell instructed Plaintiff to return within twenty-four hours for a pill count and OxyContin disposal, as he should have approximately fifty pills left. (Id.). On June 25, 2010, Plaintiff returned to Dr. Campbell at AIPM and presented fifteen OxyContin pills for his pill count. (Id.). According to Dr. Campbell, Plaintiff "should have brought back 48 tablets but states that they were lost during a recent home move." (Id.). Dr. Campbell also noted Plaintiff's "story has been different with each person that he tells it to."

(Id.).

On August 12, 2011, during a brief admission to Rex Hospital, Dr. Lori Duncan noted that she discontinued Plaintiff's morphine based on his "history of drug-seeking behavior and history of opiate abuse." She prescribed Plaintiff with Percocet on discharge, noting it could be "weaned down by the prison physician." (Id.). On August 31, 2011, Dr. Jon W. Pauli at Rex Hospital noted his "significant concern for drug-seeking behavior on the part of this gentleman." He detailed that Plaintiff was to be discharged back to the "NC Correctional Facility in stable condition. He does continue to complain of chest pain but we feel that this is pain of noncardiac etiology and does not require any additional workup at this time. In fact, should the patient continue to experience ongoing pain at the prison, it is our feeling that he can most likely be treated at the prison facility and if he does return to the emergency room for further evaluation, it is our belief that admission is not required unless the patient has EKG changes or positive cardiac enzymes. Again there is considerable concern for this gentleman's drug-seeking behavior." (Id.).

On April 17, 2012, Rex emergency room physician Dr. Kathryn De Plachett noted that Plaintiff "constantly ask[ed] for pain medication" during an emergency room visit. (Id.). Similarly, on May 17, 2012, Dr. Sohail Alvil noted in the Rex emergency room that Plaintiff's "only request to me was to get more pain medications." (Id.). On December 28, 2012, Nurse David Saunders of DPS noted that Plaintiff declared an inmate medical emergency but then refused to remain in the facility's main medical unit for observation of his reported chest and lower back pain. The day before the incident, Plaintiff had been prescribed Ibuprofen 600 mg to alleviate pain. (Id.). In a visit on January 31, 2013, Dr. Jones noted that "[Plaintiff] seems to change[] his story or add to his story but does not act like he is in pain." (Id.). Dr. Jones

changed the prescription to Percocet 5/235 mg, two tablets, four times a day for a month. On May 6, 2013, Dr. Jones mentioned Plaintiff's request for more pain medication was made despite showing a "normal gait," a "normal appearance," and not appearing to be in pain. (Id.).

Finally, in support of the summary judgment motion, Dr. Kalinski states in her affidavit that her decision to transition Plaintiff from Oxycodone to non-narcotic pain medication was a reasoned medical judgment. (Doc. No. 90-1 at ¶¶ 11-12). Dr. Kalinski states that she does not deny and never has denied that Plaintiff has problems managing his pain, and she therefore continued to provide Plaintiff with pain-relieving medication after transitioning Plaintiff away from Oxycodone. Dr. Edmundson, an internal medicine physician from Raleigh, reviewed Dr. Kalinski's care and treatment in detail and also submitted an affidavit in support of the summary judgment motion. (Doc. No. 90-2 at ¶ 4-5). Dr. Edmundson states in his affidavit that, his opinion, the records show that "Dr. Kalinski made a justified and appropriate medical decision to taper down Plaintiff's narcotic pain medication based on his cardiac health history and record of drug-seeking behavior." (Id. at ¶ 11). Additionally, Dr. Edmundson found that "no act or omission by Dr. Kalinski was a cause of any pain, back injury, cardiac event, subsequent cardiac procedure, or any other injury to Plaintiff." (Id. at ¶ 17).

## II.      STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a

detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable § 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

The Court finds that Plaintiff has not presented evidence on summary judgment to raise a

genuine dispute regarding the material fact as to whether Defendant Kalinski was deliberately indifferent to Plaintiff's serious medical needs. The summary judgment evidence shows that Defendant Kalinski provided reasonable and appropriate medical care to Plaintiff at all times. Contrary to Plaintiff's assertions, Dr. Kalinski did not suddenly or unjustifiably take away Plaintiff's narcotic pain medication. Instead, and based on valid, repeatedly observed concerns about Plaintiff's cardiac health, Plaintiff's well-documented patterns of drug-seeking behavior, and Plaintiff's personal demonstration of drug-seeking behavior to her, Dr. Kalinski made a reasonable and clinically appropriate decision to taper down Plaintiff's narcotic medication. She continued to provide pain relief measures to Plaintiff, including both medications and non-medication interventions. Plaintiff's assertion that Dr. Kalinski took away "all of [his] pain medications" is simply belied by the record evidence. The evidence on summary judgment shows that, over the six-month period that she was involved in Plaintiff's care, Dr. Kalinski saw Plaintiff and/or entered orders regarding his care on more than fifteen occasions. On at least nine different occasions, she prescribed Oxycodone (either as Percocet 5/325 mg or as Oxycodone 5 mg) to Plaintiff in response to his complaints of pain. (Doc. No. 90-1 at ¶ 15). Further addressing Plaintiff's complaints of pain, she provided Plaintiff with a walker, a specialized mattress, and non-narcotic, pain-relieving medications such as Tylenol 650 mg. (Id.). Under Dr. Kalinski's care, Plaintiff had continuous and uninterrupted access to pain-relieving medications. (Id.).

Moreover, and in contrast to Plaintiff's conclusory assertions, the evidence shows that Dr. Kalinski gradually tapered down Plaintiff's prescription of opiate narcotic medications based on sound medical judgment. Her decision was not merely based on her review of "an inaccurate report" of pain clinicians regarding Plaintiff's drug-seeking behavior. (Id. at ¶ 11). Indeed, the

16

evidence unambiguously shows that after Dr. Kalinski reviewed Plaintiff's pain clinic records, she did not suddenly discontinue his medication; instead, she continued to prescribe Plaintiff with Oxycodone in stepdown dosages.

In his brief in response to the summary judgment motion, Plaintiff accuses Dr. Kalinski of "lying" to the Court about tapering off Plaintiff's narcotic medications, and he repeats the allegations in his Complaint that Defendant stopped "Plaintiff's pain medications without any justifiable reasons and left plaintiff with nothing for the severe pain plaintiff experienced continuously 24/7 with his back." (Doc. No. 96 at 1). Plaintiff's allegations are simply belied by the undisputed evidence on summary judgment, which shows that Dr. Kalinski gradually tapered down Plaintiff's narcotic medications and replaced them with non-narcotic pain medications. Furthermore, although Plaintiff attempts in his response brief to point to inconsistencies between Dr. Kalinski's statements regarding his treatment and the medical records, Plaintiff has not raised any disputed issues of material fact.[2] Finally, in his response brief, Plaintiff asserts personal opinions about medical standards of care and medical causation, alongside a claim that an expert witness would likely agree with Plaintiff's conclusions. Plaintiff's own personal medical opinions are incompetent, speculative evidence and are simply not admissible on summary judgment. See FED. R. EVID. 701. In sum, for all these reasons, the Court finds that Defendant Kalinski is entitled to summary judgment.[3] Accord Baker v. Stevenson, No. 14-1534, 2015 WL

---

[2] Indeed, Plaintiff's categorization in his response brief of the summary judgment evidence is simply incorrect. For instance, Plaintiff takes issue with Defendant's assertion that on August 22, 2013, Plaintiff refused to go to the hospital following cardiac pain, and he claims that nowhere in the medical records does it state that Plaintiff refused to go to the hospital on that date. As Defendant notes in her Reply brief, however, Plaintiff's medical records clearly contain a notation from August 22, 2013, stating that "[patient] is having symptoms of an MI, but is refusing to go to the hospital." (Doc. No. 97 at 5) (citing Doc. No. 90-3 at 1).

[3] The Court also notes that, as Defendant observes in her Reply brief, Plaintiff appears to

1404854 (6th Cir. Mar. 30, 2015) (unpublished) (upholding the dismissal of a deliberate

indifference claim brought by an inmate who was denied access to opiate medications based on

his history of substance abuse); <u>DeBoer v. Luy</u>, 70 Fed. Appx. 880, 882 (7th Cir. 2003)

(unpublished) (noting that a prison doctor "had to weigh the efficacy of powerful pain killers

against their addictiveness," and finding that "this kind of delicate balancing between the

benefits of pain relief and the risk of addiction can be characterized fairly as a classic example of

a matter for medical judgment that falls outside the purview of the Eighth Amendment")

(internal quotation marks omitted); <u>Bowman v. Johnson</u>, No. 3:08CV449-HEH, 2010 WL

3835066 (E.D. Va. Sept. 24, 2010) (dismissing an inmate's deliberate indifference claim arising

from the prison physicians' decision to prescribe a non-narcotic pain medication); <u>Cassell v.

Dawkins</u>, No. 5:10CV69-03-MU, 2010 WL 2266972, at *2 (W.D.N.C. June 3, 2010) (stating

that "the fact that [the physician] took [the inmate] off at least one highly addictive narcotic

medication and put him on another pain medication is not grossly incompetent, inadequate or

excessive as to shock the conscience or to be intolerable to fundamental fairness.  It would be an

altogether different claim if Plaintiff stated, which he does not, that [the doctor] abruptly took

him off his pain medication and refused to put him on any other pain medications.") (citations

and quotations omitted), <u>aff'd</u>, 397 F. App'x 849 (4th Cir. 2010).

 In sum, for the reasons stated herein, Defendant is entitled to summary judgment.

---

attempt to raise, in his response to the summary judgment motion, an altogether new theory of
his claim of deliberate indifference to serious medical needs based on his contention that
Defendant failed to treat him for various cardiac issues.  In addition to the fact that Plaintiff did
not exhaust his administrative remedies as to any such claim, this newly raised claim is wholly
without merit, as Dr. Kalinski's affidavit and Plaintiff's own medical records show that
Defendant addressed all of Plaintiff's health issues—including cardiac issues—appropriately.

## IV.    CONCLUSION

Plaintiff has failed to raise a genuine dispute of material fact as to whether Defendant may be held liable for deliberate indifference to Plaintiff's serious medical needs, and Defendant is therefore entitled to summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 90), is **GRANTED**, and this action is dismissed with prejudice.

2. Plaintiff's Motion for Issuance of Subpoena for Copy of Dept. of Public Safety, (Doc. No. 95), is **DENIED** as moot and because the discovery period has long since expired.

3. The Clerk is respectfully instructed to terminate this action.

Signed: August 27, 2015

Frank D. Whitney
Chief United States District Judge